UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHIRLEY HOLLINS,            )
                           )
              Plaintiff,    )
                           )
       v.                   )      No.  4:08CV462 RWS
                           )                    (FRB)
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,         )
                           )
              Defendant.    )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal for review of an adverse ruling by the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I. Procedural History**

On November 16, 2005, Shirley Hollins filed an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., in which she claimed her disabling impairment began in 1999. (Tr. 116-19.)[1] On initial consideration, the Social Security Administration denied plaintiff's application for benefits. (Tr.

_____

[1]Plaintiff filed previous applications for benefits which were denied by administrative law judges in written decisions. (Tr. 19-60.) Nothing in the record shows plaintiff to have pursued these applications further. With respect to the previous applications, the last denial of benefits occurred on September 14, 2004. (Tr. 43-60.) As such, with respect to the instant application for benefits presently under review, the Social Security Administration considered plaintiff's alleged onset date of disability to be September 15, 2004. (Tr. 113-15.)

61, 92-97.)  On September 17, 2007, a hearing was held before an administrative law judge (ALJ).  (Tr. 345-66.)  Plaintiff testified and was represented by counsel.  On November 15, 2007, the ALJ issued a decision denying plaintiff's claim for benefits.  (Tr. 8-18.)  On March 4, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 2-5.)  The ALJ's determination of November 15, 2007, thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

At the hearing on September 17, 2007, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that she lives alone in an apartment for which her sister, brother and cousin pay rent.  (Tr. 350, 353, 362.)  Plaintiff testified that her only source of income is food stamps.  (Tr. 362.)

Plaintiff testified that she previously worked at a nursing home performing cleaning services.  Plaintiff testified that she also worked at the polls for St. Louis County during the election season.  (Tr. 349.)

The ALJ questioned counsel as to plaintiff's diagnosed conditions to which counsel responded that records from St. Louis University Department of Neurology described epilepsy, petit mal seizures, and grand mal seizures.  (Tr. 351.)  Counsel also described plaintiff's repeated attempts to obtain medical treatment for her condition, but indicated that she received little help. (Tr. 352.)  To the extent the ALJ referred to plaintiff's non-

compliance with medication, counsel advised that plaintiff's Medicaid had been suspended. Plaintiff concurred in that statement. (Tr. 352-53.)

Plaintiff testified that she experiences seizures every day during which she feels "like [her] head is going around." (Tr. 354.) Plaintiff testified that she sits or lies down until the feeling passes because she has fallen to the floor many times in the past during such episodes. Plaintiff testified that the feeling passes in about twenty minutes. (Tr. 354.) Plaintiff testified that she takes medication every day but that the medication does not help her condition. Plaintiff testified that she nevertheless continues with her medication because her doctor tells her to do so. (Tr. 353.) Plaintiff testified that nurses used to come to her home, but that they no longer did so because Medicaid no longer provided benefits to plaintiff. (Tr. 359.)

Plaintiff testified that she used to drink beer with her medication but that she had not done so since her doctor advised her to stop. Plaintiff also testified that she no longer abused cocaine and alcohol. Plaintiff testified that she currently smokes about two cigars a day. (Tr. 356.)

As to her daily activities, plaintiff testified that she awakens between 4:00 and 6:00 a.m. and does nothing because she has no energy. Plaintiff testified that she sometimes eats breakfast depending upon her appetite. (Tr. 357.) Plaintiff testified that she is unable to care for herself in the apartment, but that her cousins come by on a daily basis to check on her. (Tr. 355-56.)

Plaintiff testified that her cousins help her bathe and take care of her personal needs. (Tr. 357-58.) Plaintiff testified that she cannot comb her hair because of arthritis in her hands, and that her hands and legs give out on her. (Tr. 358.) Plaintiff testified that she watches television every day and listens to the radio. Plaintiff testified that one of her cousins brings her lunch, and that she then sits during the remainder of the afternoon waiting for someone to bring her something to eat. Plaintiff testified that she just sits during the evening and goes to bed early. (Tr. 358-59.) Plaintiff testified that she likes to go shopping but does not have the energy to do it. Plaintiff testified that her cousins perform the housework and do the grocery shopping. (Tr. 359-60.) Plaintiff testified that she does not leave her home except on a rare occasion to attend church services. (Tr. 360.) Plaintiff testified that she last attended church around Christmastime in 2005. Plaintiff testified that she no longer goes to church because she feels bad and does not feel like doing anything. (Tr. 360-61.)

As to exertional abilities, plaintiff testified that she can stand for about two minutes and then experiences pain. Plaintiff testified that she has difficulty walking because she cannot put weight on her left side due to an earlier mild stroke. (Tr. 362.) It was noted that plaintiff was currently rocking back and forth in her seat, and she testified that she was experiencing pain in the left buttock area. (Tr. 362-63.) Plaintiff testified that she mostly lies down because she experiences pain after she

sits for about two minutes. (Tr. 363.) Plaintiff testified that she must constantly change positions throughout the day between lying down and getting up and moving about. (Tr. 364.) Plaintiff testified that she can lift and carry no more than five pounds. (Tr. 365.)

### III. Medical Records

On January 9, 2003, plaintiff visited Dr. Jawed H. Siddiqui of Metro Cardiovascular Diagnostics for results of recent tests. (Tr. 341-44.) It was noted that plaintiff was independent in her activities of daily living. Plaintiff complained of insomnia and of depressive symptoms. Plaintiff's hypertension was noted to be borderline. Plaintiff's current medications were noted to include Niferex,[2] Diovan, Toprol, Lotrel, Clonidine, and Atacand.[3] Plaintiff was prescribed Lexapro[4] and was instructed to return in four weeks. (Tr. 341.) Plaintiff returned for follow up on February 4, 2003. (Tr. 340.)[5]

On February 6, 2003, plaintiff was admitted to the emergency room at Forest Park Hospital complaining of a sudden

---

[2]Niferex provides iron needed by the body to produce red blood cells and is used to treat or prevent iron-deficiency anemia. Medline Plus (last updated July 20, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682778.html>.

[3]Diovan, Toprol, Lotrel, Clonidine, and Atacand are indicated for the treatment of hypertension. Physicians' Desk Reference 2166-67, 606, 2189-90, 968-67, 564-65, respectively (55th ed. 2001).

[4]Lexapro is used to treat depression and generalized anxiety disorder. Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a603005.html>.

[5]The treatment notes from this follow up visit are illegible.

onset of shooting pain traveling from her left knee to her hip, and of numbness in her left foot.  Plaintiff reported that she had experienced episodes during the previous five years of her legs going out.  X-rays of the knee and hip were negative.  Plaintiff's knee was placed in an immobilizer, and plaintiff was discharged that same date in improved condition.  (Tr. 334-39.)

Plaintiff returned to Dr. Siddiqui on July 3, 2003.  It was noted that plaintiff's blood pressure was elevated and that plaintiff took Lotrel for the condition.  Dr. Siddiqui noted plaintiff to have had two cerebrovascular accidents (CVA's) and to have a seizure disorder.  Physical examination was unremarkable. Plaintiff was diagnosed with hypertension and was referred to podiatry, neurology and cardiology for further examination.  On July 16, 2003, plaintiff returned to Dr. Siddiqui who noted plaintiff's laboratory tests to show her to be anemic.  Plaintiff reported to Dr. Siddiqui that she had a hole in her heart. Plaintiff was diagnosed with dysfunctional uterine bleeding (DUB) and was referred to gynecology.  (Tr. 330.)

Plaintiff visited Dr. Siddiqui on September 12, 2003, who continued in his diagnoses of DUB and anemia.  Plaintiff was referred to hematology and gynecology.  On October 7, 2003, plaintiff returned to Dr. Siddiqui's office.  Recommended treatment was noted for her gynecological condition.  It was noted that plaintiff complained of tiredness.  (Tr. 329.)

On November 10, 2003, Dr. Siddiqui noted plaintiff to have an enlarged thyroid gland.  Plaintiff was diagnosed with

goiter and was referred to endocrinology. (Tr. 328.)

Plaintiff returned to Dr. Siddiqui on January 23, 2004, and complained of depression. Dr. Siddiqui noted plaintiff's depression to be mainly over financial matters. Plaintiff was noted to have recovered from a hysterectomy procedure. Plaintiff was noted to be taking Tarka[6] and Lexapro. Plaintiff was diagnosed with hypertension and depression. (Tr. 328.)

On February 13, 2004, plaintiff complained to Dr. Siddiqui of feeling tired. Plaintiff also complained of having a sore neck. Dr. Siddiqui diagnosed plaintiff with muscle spasm and hypertension, and prescribed Tarka and Skelaxin[7] for plaintiff. (Tr. 327.)

On March 24, 2004, plaintiff reported to Dr. Siddiqui that she had some improvement of her depression with Lexapro. Plaintiff was instructed to increase her dosage of Lexapro and to return in two weeks for follow up. (Tr. 327.)

On April 8, 2004, Dr. Siddiqui noted plaintiff's blood pressure to be elevated. It was noted that plaintiff was taking Tarka. Plaintiff was instructed to continue with Tarka and

---

[6]Tarka is indicated for treatment of hypertension. Physicians' Desk Reference 1644-45 (55th ed. 2001). This medication is also marketed under the name "Mavik." See Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a697010.html>.

[7]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1080 (55th ed. 2001).

Lexapro, and Maxzide[8] was prescribed.  (Tr. 326.)

On May 9, 2004, plaintiff complained to Dr. Siddiqui of "blanking" or "falling" out two or three days prior.  Plaintiff reported that she did not lose consciousness during the episode. It was noted that the episode occurred only once and with position change.  It was noted that Maxzide was recently added to plaintiff's medication regimen.  Plaintiff was diagnosed with syncope and was referred to cardiology and neurology for further evaluation.  Plaintiff was instructed to continue with her medications for hypertension.  (Tr. 326.)

Plaintiff returned to Dr. Siddiqui on June 9, 2004, for "[follow up] of her 'seizure' activity."  (Tr. 323.)  Plaintiff presented a history of back pain, seizures and high blood pressure. It was noted that plaintiff determined not to proceed with cardiac catheterization as recommended by cardiology.  It was recommended that plaintiff undergo a neurological consultation.  Plaintiff was diagnosed with seizure disorder and hypertension and was instructed to take Zanaflex,[9] Tarka and triamterene.  Plaintiff was instructed to discontinue Lexapro.  (Tr. 323.)

Plaintiff was admitted to the emergency room at Christian Hospital on November 16, 2004.  Plaintiff had experienced a seizure

---

[8]Maxzide (triamterene) is indicated for the treatment of hypertension or edema.  Physicians' Desk Reference 943-44 (55th ed. 2001).

[9]Zanaflex is used to relieve the spasms and increased muscle tone caused by multiple sclerosis, stroke, or brain or spinal injury.  Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601121.html>.

resulting in a loss of consciousness. Plaintiff's nine-year
history of seizure disorder was noted. Plaintiff's medications
were noted to include Phenytoin,[10] Tarka, Skelaxin, and triamterene.
It was also noted that plaintiff was noncompliant with her
medications. Chest x-rays were normal. Plaintiff was discharged
on November 17, 2004, and was prescribed Thiamine[11] and Dilantin
upon discharge. Plaintiff was diagnosed with recurrent seizure and
was specifically instructed not to drink alcohol, to take her
medication as prescribed, and not to miss any doses of Dilantin.
(Tr. 294-311.)

Plaintiff visited Dr. Reynal L. Caldwell on December 1,
2004, for follow up of her seizure disorder. Plaintiff's blood
pressure was noted to be elevated. Plaintiff reported that she
stopped drinking alcohol. Plaintiff's medications were noted to
include Dilantin, Skelaxin and Tarka. Plaintiff was diagnosed with
seizure disorder. Plaintiff's Dilantin level was to be checked.
(Tr. 216.)

An MRI of the brain performed on January 10, 2005, at St.
Louis University (SLU) Hospital in response to plaintiff's reports
of seizure activity was negative. (Tr. 322.) An EEG performed
that same date was abnormal, with findings consistent with
generalized seizure disorder and evidence of an "old" stroke. (Tr.

---

[10]Phenytoin (Dilantin) is indicated for the control of
generalized tonic-clonic and complex partial seizures. Physicians'
Desk Reference 2427 (55th ed. 2001).

[11]Thiamine is a vitamin used by the body to break down sugars
in the diet. Medline Plus (last reviewed Sept. 1, 2008)<http://
www.nlm.nih.gov/medlineplus/druginfo/meds/a682586.html>.

320.)

On April 25, 2005, plaintiff reported to Dr. Caldwell that she recently had two seizures. Plaintiff also reported having a lot of personal stress. Dr. Caldwell determined to check plaintiff's Dilantin level. In May and June 2005, plaintiff's prescription for Dilantin was refilled. (Tr. 211.)

On July 13, 2005, plaintiff was admitted to the emergency room at Christian Hospital after having suffered a grand mal seizure. (Tr. 261-293.) Upon admission, plaintiff reported having had shortness of breath with minimal exertion for approximately ten years, with such condition worsening. (Tr. 264.) Pulmonary functioning tests were essentially unremarkable. (Tr. 293.) Plaintiff reported that she smoked three cigars a day and had a past history of cocaine and alcohol abuse. Plaintiff reported that she had not had any seizures recently and was taking her medication as prescribed. (Tr. 264.) It was noted that plaintiff's Dilantin level was low. A CT scan of the head was unremarkable. An MRI of the brain and MRA of the neck showed possible adenoidal hypertrophy, but were otherwise unremarkable. (Tr. 262.) Chest x-rays were unremarkable. (Tr. 265.) An EEG showed no definite seizures, but it was noted that "the tendency is there with epileptogenic potential bilaterally." (Tr. 291.) It was questioned whether plaintiff experienced a seizure or possible syncope. (Tr. 265.) Plaintiff underwent a neurological consultation from which Dr. Waqar U. Mirza had the following impressions: epilepsy, not otherwise specified, intractable, maybe

with multiple handicaps; noncompliance versus inadequate information; inadequate absorption of Dilantin; borderline intelligence; chronic obstructive pulmonary disease; hypertension; and goiter. (Tr. 269.) Plaintiff had no seizure activity after being admitted to the hospital and was discharged on July 16, 2005, with diagnoses of epilepsy, possible medication noncompliance, and hypertension. Extreme diligence was stressed to plaintiff with respect to medication compliance with Dilantin. Plaintiff was given new prescriptions of Lopressor[12] and Mavik upon discharge, with a note that her blood pressure was well controlled on these medications. (Tr. 262-63.)

Plaintiff visited Dr. Caldwell on July 19, 2005, for a check on her thyroid levels. Plaintiff was diagnosed with seizure disorder and a thyroid panel was ordered. (Tr. 209.)

Plaintiff returned to Dr. Caldwell on July 25, 2005, and complained of feeling dizzy and heavy-headed. Plaintiff also reported that her head was stuffy and her ears were stopped up. Dr. Caldwell diagnosed plaintiff with labyrinthitis. (Tr. 205.) On that same date, Dr. Caldwell wrote a letter to "To Whom Concerned" in which he stated, "The unstable medical condition has prevented, Miss Hollins, from employment. The medical event has the tendency to cause injury to herself and the possibility to others as well. Therefore, Miss Hollins, will not be able to be gainfully employed." (Tr. 206.)

---

[12]Lopressor is used to treat high blood pressure. <u>Medline Plus</u> (last revised Apr. 1, 2009)<<u>http://www.nlm.nih.gov/medlineplus/</u> druginfo/meds/a682864.html>.

On August 4, 2005, plaintiff reported to Dr. Caldwell that she continued to have seizures. Plaintiff reported that Dilantin was not working in that proper Dilantin levels could not be maintained. Plaintiff was diagnosed with seizure disorder and Tegretol[13] was prescribed. (Tr. 205.)

On October 3, 2005, plaintiff was admitted to SLU Hospital to undergo continuous EEG monitoring for seizure activity. (Tr. 314-19.) Upon admission, plaintiff reported having had "large" seizures in July 2003, April 2004, and August 2005. Plaintiff also reported having "light" seizures during which she feels light-headed and heavy-headed, and experiences dizziness and double vision. (Tr. 314.) Physical examination was unremarkable. (Tr. 314-15.) The four-day continuous EEG monitoring

> revealed multiple events, mainly while the
> patient was exercising, consistent with her
> usual small seizure activity. She described
> these events as feeling heavy-headed with
> diplopia and generalized weakness following
> the events. She was tired following the
> events as well. No abnormal epileptiform
> activity was noted on EEG during any of these
> events. There was intermittent spikes noted
> in the left temporal region. Inter-ictally,
> however, none of these discharges were noted
> during any of her events.

(Tr. 315.)

Upon conclusion of this clinical study, plaintiff was diagnosed with nonepileptic seizures and hypertension. Plaintiff was instructed not to drive until she had gone six months without

---

[13]Tegretol is indicated for use as an anti-convulsant drug. Physicians' Desk Reference 2220 (55th ed. 2001).

seizures.   Upon  discharge,  plaintiff's  medications  included
Tegretol, Dilantin and Naproxen.[14]  (Tr. 314.)

Plaintiff returned to Dr. Caldwell on October 11, 2005.
Plaintiff reported that "she has another type of seizure that
med[ication] won't help."  Plaintiff's blood pressure was noted to
have increased.  Plaintiff was diagnosed with hypertension and
seizure disorder.  Plaintiff was instructed to continue on her
medications.  (Tr. 198.)

On November 3, 2005, plaintiff complained to Dr. Caldwell
of experiencing spasming in her neck while she sleeps and of
experiencing epigastric pain after she eats.   Medication was
prescribed and gastrointestinal testing was recommended.  (Tr.
197.)

Dr. Bruce Lee Hall examined plaintiff on January 26,
2006, for evaluation of moderately severe goiter.  Dr. Hall noted
plaintiff's medical history to include hypertension, seizure
disorder, epilepsy, minor strokes, chronic shortness of breath, and
COPD. Upon examination and review of laboratory findings, Dr. Hall
recommended that plaintiff undergo total thyroidectomy. (Tr. 189-
90, 230.)

Plaintiff returned to Dr. Caldwell on January 31, 2006,
who noted plaintiff's seizures to be controlled with Tegretol.  Dr.

---

[14]Naproxen is indicated for the treatment of rheumatoid
arthritis, osteoarthritis, ankylosing spondylitis, and for the
management of pain.  Physicians' Desk Reference 2744-45 (55th ed.
2001).  Naproxen is also marketed under the name "Naprosyn."  See
Medline Plus (last reviewed Sept. 1, 2008) <http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a681029.html>.

Caldwell continued in his diagnosis of seizure disorder and plaintiff was instructed to continue with her medications. (Tr. 197.)

Plaintiff was admitted to Barnes-Jewish Hospital on March 8, 2006, to undergo a total thyroidectomy. Plaintiff was discharged the following date with instructions to engage in no strenuous activity for two weeks. (Tr. 245-52.) On June 23, 2006, Dr. Hall noted that plaintiff did not return for her routine postoperative check, but that she followed up postoperatively with Dr. Ojha. (Tr. 223.)

In April and June 2006, plaintiff followed up with Dr. Caldwell regarding her hypertension which had become uncontrolled. Plaintiff was instructed to take Tarka and Maxzide. (Tr. 195, 196.)

Plaintiff visited the Department of Neurology at SLUCare on July 13, 2006. Plaintiff's history of seizure activity was noted. Plaintiff reported having had epilepsy since childhood. It was noted that plaintiff's last visit was in January 2006 at which time her dosage of Tegretol was increased. Plaintiff reported having no side effects from the medication. Plaintiff reported that she experiences daily episodes of feeling heavy-headed. Plaintiff reported that she sits down during these episodes because she feels that she is about to pass out. Plaintiff reported that the episodes wear off when she lies down. Physical examination was generally unremarkable. Upon examination of plaintiff's gait, it was noted that plaintiff was unable to walk on her toes in that she experienced pain in her left foot. Plaintiff was noted to be

stable during Romberg testing. Upon conclusion, plaintiff was diagnosed with epilepsy, but it was noted that there was some focal consideration to her symptoms as well as generalized tonic-clonic seizures. It was noted that plaintiff was having episodes that seemed non-seizure. Plaintiff was instructed to continue with Tegretol and further testing was ordered. (Tr. 221-22.)

Plaintiff visited Dr. Caldwell on August 15, 2006, to discuss her condition. It was noted that plaintiff had "to try to justify why she needs medication." Physical examination was unremarkable. Plaintiff was diagnosed with seizure disorder, hypothyroidism, and hypertension. Dr. Caldwell ordered no change to plaintiff's treatment. (Tr. 193.)

On September 8, 2006, plaintiff visited Dr. Caldwell with complaints of arthritis in her hands. Naprosyn was prescribed. Plaintiff was referred to podiatry for complaints of bunions. (Tr. 192.)

### IV. The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since the date of her application for benefits, that is, November 16, 2005. The ALJ determined plaintiff's seizure disorder and hypertension to constitute severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equalled any impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms not to be entirely

credible. The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform light work, but that she was precluded from exposure to fumes, dust and gases; working at unprotected heights; working with or around hazardous machinery; and climbing ropes, ladders and scaffolds. The ALJ found plaintiff unable to perform her past relevant work. Considering plaintiff's age of forty-five, high school education, lack of transferable skills, and RFC to perform light work, the ALJ determined that the Medical-Vocational Guidelines would direct a finding that plaintiff was not disabled given that plaintiff's additional limitations had little or no effect on the occupational base of unskilled light work. The ALJ thus determined that plaintiff was not under a disability since November 16, 2005. (Tr. 11-17.)

## V. Discussion

To be eligible for Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to

- 16 -

do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42

U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ failed to properly consider plaintiff's credibility under the standards as articulated in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984); and erred by failing to elicit testimony from a vocational expert in light of the ALJ's finding that plaintiff suffered from nonexertional impairments. The Court will address each of plaintiff's contentions in turn.

A.    <u>Credibility Determination</u>

Plaintiff claims that the ALJ erred in her determination that plaintiff's allegations of disabling symptoms were not credible.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the

complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, she may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id.

Where, as here, a plaintiff contends on judicial review that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in her decision that she considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001); see also Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility

is for the Commissioner, and not the Court, to make.  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

In this cause, the ALJ identified several inconsistencies in the record which detracted from plaintiff's credibility. Specifically, the ALJ noted that despite plaintiff's claim that she suffered from a seizure disorder since her teens, plaintiff did not seek definitive treatment of the condition until 2005 and thus was apparently able to work with the condition. See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (claimant's failure to seek consistent treatment supported adverse credibility determination); Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996) (failure to seek medical treatment for symptoms inconsistent with subjective complaints of disabling condition); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem."); Barrett v. Shalala, 38 F.3d 1019, 1023-24 (8th Cir. 1994) (failure to seek aggressive medical treatment not suggestive of disabling condition); see also Goff v. Barnhart, 421 F.3d 785, 792-93 (8th Cir. 2005) (claimant having worked with impairment and lack of evidence that condition deteriorated supported adverse credibility determination); Gregg, 354 F.3d at 713 (same).  The ALJ also noted the objective medical evidence not to support plaintiff's claims of a disabling seizure disorder, specifically noting that CT and other brain imaging studies were negative and that plaintiff was never observed as having a seizure while in any

treatment facility.  See Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) (ALJ may consider contrary medical evidence in determining credibility of plaintiff's subjective complaints).  The ALJ also noted that no physician placed any employment restrictions on plaintiff.  See Hensley v. Barnhart, 352 F.3d 353, 356 (8th Cir. 2003) (subjective complaints not credited where doctors placed few, if any, functional limitations on claimant); Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993) (lack of any significant restrictions on claimant's activities by doctors inconsistent with claims of disabling condition).  In addition, the ALJ noted the record to show that on various occasions, plaintiff was noted to be noncompliant with her medications.  See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (failure to comply with treatment recommendations properly considered by ALJ in credibility determination).  Indeed, the ALJ noted that, upon hospitalizations whereupon plaintiff was provided medication at therapeutic levels, no seizure activity was observed.  Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729-30 (8th Cir. 2003) (impairments controllable by medication do not support a finding of total disability).  Finally, the ALJ determined that because the above-stated reasons showed plaintiff's credibility to be lacking with regard to her allegations of disability, her claims regarding her limited daily activities were likewise not credible.

Plaintiff claims that the ALJ erred in her credibility analysis inasmuch as she failed to set out which specific daily activities were inconsistent with plaintiff's complaints of

disabling symptoms. Plaintiff's argument is misplaced. Daily activities alone do not prove or disprove disability. <u>Wilson</u>, 76 F.3d at 241. They are but one factor for the ALJ to consider in evaluating a claimant's credibility. <u>Id.</u> The ALJ here did not set out in her decision how plaintiff's daily activities in themselves were inconsistent with her claims of disabling conditions. Instead, the ALJ determined not to credit plaintiff's testimony regarding her total inability to engage in any activity in light of the inconsistencies in the record relating to plaintiff's symptoms; the extent to which plaintiff sought, received and complied with medical treatment; and the lack of physician-imposed functional restrictions. The ALJ acknowledged plaintiff's testimony regarding her inability to engage in any daily activity (Tr. 15) and determined not to credit that testimony in light of the inconsistencies in the record as a whole. An ALJ does not have to believe every detail of a claimant's version of her daily activities. <u>See</u> <u>Benskin v. Bowen</u>, 830 F.2d 878, 883 (8th Cir. 1987). The ALJ considered plaintiff's daily activities in her decision and, when combined with consideration of the other <u>Polaski</u> factors, determined plaintiff not to be credible. The manner in which the ALJ considered plaintiff's daily activities was not error.

Plaintiff also argues that the ALJ erred in relying on plaintiff's failure to comply with prescribed treatment, inasmuch as the ALJ was required but failed to first determine whether such treatment would have restored plaintiff's ability to engage in

substantial gainful activity. Again, plaintiff's argument is misplaced. An otherwise disabled claimant may be denied benefits on the basis that she has failed to follow prescribed treatment. See Holley, 253 F.3d at 1092. In such circumstances, the ALJ must determine whether compliance with treatment would restore the claimant's ability to work. Id.; 20 C.F.R. § 416.930. In the instant case, however, the ALJ analyzed the evidence of plaintiff's failure to comply with treatment solely to weigh the credibility of her subjective complaints, and not as a basis upon which to deny benefits. This use of evidence of failure to comply with prescribed treatment, without determining whether such treatment would restore plaintiff's ability to work, is permissible. Holley, 253 F.3d at 1092.

Finally, plaintiff challenges the ALJ's finding that there were no physician-imposed limitations, arguing that "the medical records clearly indicate and support the notion Plaintiff has a seizure disorder." (Pltf.'s Brief at 10.) Contrary to the allusion made by plaintiff's statement, the ALJ does not deny the existence of plaintiff's seizure disorder. Indeed, the ALJ determined the disorder to constitute a severe impairment. However, upon review of the evidence on the record as a whole, including the lack of physician-imposed restrictions on plaintiff's activities, the ALJ found that plaintiff's seizure disorder did not result in the extreme limitations as described by plaintiff. Such consideration was not error.

A review of the ALJ's decision shows that, in a manner

consistent with and as required by Polaski, the ALJ considered
plaintiff's subjective complaints on the basis of the entire record
before her and set out numerous inconsistencies detracting from
plaintiff's credibility.    The ALJ may disbelieve subjective
complaints where there are inconsistencies on the record as a
whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).
Because the ALJ's determination not to credit plaintiff's
subjective complaints is supported by good reasons and substantial
evidence on the record as a whole, this Court must defer to the
ALJ's credibility determination.  Goff, 421 F.3d at 793; Vester v.
Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Gulliams v. Barnhart,
393 F.3d 798, 801 (8th Cir. 2005).

B.    Nonexertional Impairments

        In her decision, the ALJ determined plaintiff to have the
RFC to perform light work but was precluded from engaging in work
which involved exposure to fumes, dust and gases; working at
unprotected heights; working with or around hazardous machinery;
and climbing ropes, scaffolds, and ladders.  Upon consideration of
plaintiff's age, education, vocational factors, and RFC, the ALJ
determined that these additional limitations had little or no
effect on the occupational base of unskilled light work, and thus,
that the Medical-Vocational Guidelines directed a finding that
plaintiff was not disabled.  (Tr. 17.)  Plaintiff claims that the
various nonexertional impairments as set out by the ALJ precluded
the ALJ's reliance on the Guidelines in finding plaintiff not to be
disabled, and that the ALJ was required to elicit testimony from a

vocational expert regarding plaintiff's ability to work.  For the following reasons, plaintiff's argument is well taken.

Residual functional capacity is defined wholly in terms of the physical ability to perform certain exertional tasks.  If a claimant suffers from only exertional impairments, the Commissioner may refer to the Medical-Vocational Guidelines to conclude whether the claimant has the RFC to perform work which exists in significant numbers in the national economy.  See Pearsall, 274 F.3d at 1219; Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999).  If a claimant has a nonexertional impairment, the Guidelines generally are not controlling and cannot be used to direct a conclusion of disabled or not disabled without regard to other evidence, such as vocational testimony.  Hunt v. Heckler, 748 F.2d 478, 480 (8th Cir. 1984).  Use of the Guidelines is permissible, however, where a nonexertional impairment is found to exist "provided that the ALJ finds, and the record supports the finding, that the non-exertional impairment does not significantly diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines."  Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir. 1995) (citing Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir. 1988)).  See also Bolton v. Bowen, 814 F.2d 536, 537-38 (8th Cir. 1987).  The burden is on the ALJ to demonstrate that the use of the Guidelines is proper.  Lewis v. Heckler, 808 F.2d 1293, 1298 (8th Cir. 1987).

In response to plaintiff's contention here, the

Commissioner argues that Social Security Rulings 83-14[15] and 85-15[16] support the ALJ's determination that plaintiff's nonexertional limitations do not erode the occupational base of light work as set out in the Guidelines inasmuch as such nonexertional impairments are specifically described in the Rulings as examples of restrictions which have little or no effect on the occupational base for unskilled light work. The Commissioner appears to read these examples in isolation. A complete reading of the Rulings shows the ALJ's determination to be in error.

A nonexertional impairment is one which is

medically determinable and causes a nonexer-
tional limitation of function or an environ-
mental restriction. Nonexertional impairments
may or may not affect a person's capacity to
carry out the primary strength requirements of
jobs, and they may or may not significantly
narrow the range of work a person can do.

SSR 85-15, 1983-1991 Soc. Sec. Rep. Serv. 343, 1985 WL 56857 at *2.

Social Security Ruling 85-15 provides examples of nonexertional limitations and their effects on the occupational base. Such examples include those limitations found by the ALJ here, and specifically, limitations in climbing and balancing, and environmental restrictions:

---

[15]SSR 83-14 addresses the use of the Guidelines as a framework for decisions involving claimants who have both a severe exertional impairment and a nonexertional limitation.

[16]SSR 85-15 addresses the use of the Guidelines as a framework for decisions involving claimants who have only nonexertional limitations.

Limitations on climbing and balancing can have
varying effects on the occupational base,
depending on the degree of limitation and the
type of job. . . . Where a person has some
limitation in climbing and balancing and it is
the only limitation, it would not ordinarily
have a significant impact on the broad world
of work.

Id. at *6 (emphasis added).

Surroundings which an individual may need to
avoid because of impairment include those
involving . . . recognized hazards such as
unprotected elevations and dangerous moving
machinery; and fumes, dust, and poor
ventilation. A person with a seizure disorder
who is restricted only from being on
unprotected elevations and near dangerous
moving machinery is an example of someone
whose environmental restriction does not have
a significant effect on work that exists at
all exertional levels.

Where a person has a medical restriction to
avoid excessive amounts of noise, dust, etc.,
the impact on the broad world of work would be
minimal because most job environments do not
involve great noise, amounts of dust, etc.

Where an individual can tolerate very little
noise, dust, etc., the impact on the ability
to work would be considerable because very few
job environments are entirely free of
irritants, pollutants, and other potentially
damaging conditions.

Where the environmental restriction falls
between very little and excessive, resolution
of the issue will generally require consulta-
tion of occupational reference materials or
the services of a [vocational specialist].

Id. at *8 (emphasis added).

Here, the ALJ found plaintiff's nonexertional limitations
to preclude her from engaging in work which involved climbing
ropes, ladders, and scaffolds. If climbing was the only

nonexertional limitation found by ALJ, her determination that such limitation did not significantly affect plaintiff's ability to perform light work would be supported by SSR 85-15, as argued by the Commissioner.  However, the ALJ found additional nonexertional limitations, namely environmental limitations relating to dust, gases, and fumes; and additional environmental limitations relating to dangerous machinery and unprotected heights.  Likewise, if the ALJ determined that plaintiff's seizure disorder restricted her <u>only</u> from being on unprotected elevations and dangerous moving machinery, her determination that such restrictions did not significantly affect plaintiff's ability to perform light work would also be supported by SSR 85-15, as argued by the Commissioner.  However, as noted above, the ALJ found additional restrictions, namely preclusion from climbing and preclusion from exposure to dust, gases, and fumes.  In light of these multiple nonexertional restrictions, it cannot be said that SSR 85-15 dictates a finding that the occupational base of unskilled light work is not eroded by plaintiff's limitations.

In addition, the undersigned notes that although the ALJ found plaintiff's impairments to "preclude" exposure to fumes, dust and gases, the ALJ did not articulate whether plaintiff was to avoid only excessive dust, etc.; could tolerate very little of these elements; or whether plaintiff's limitation fell somewhere in-between.  "Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the

services of a vocational specialist." SSR 85-15, 1985 WL 56857, at *8.

A reading of SSR 83-14 yields the same result. Although SSR 83-14 recognizes some nonexertional limitations to have very little or no effect on the unskilled light occupational base (such as the inability to ascend or descend scaffolding, poles and ropes, or to be exposed to certain environmental elements such as feathers), the Ruling nevertheless states that the assistance of a vocational specialist is often required "[w]here nonexertional limitations or restrictions within the light work category are between [these] examples[.]" SSR 83-14, 1983-1991 Soc. Sec. Rep. Serv. 41, 1983 WL 31254 at *5. The ALJ here found plaintiff to have nonexertional limitations beyond those described in SSR 83-14 as having little or no effect on the occupational base for unskilled light work.

In light of the ALJ's finding that plaintiff suffers from multiple nonexertional impairments, and given the nature of such impairments, it cannot be said that the ALJ satisfied her burden in demonstrating that the use of the Guidelines was proper. This is especially evident from a reading of SSR 85-15 which counsels that such impairments cannot be viewed in isolation when determining whether an occupational base is affected thereby. Accordingly, this cause should be remanded to the Commissioner for appropriate consideration of plaintiff's nonexertional impairments and to consult and obtain testimony from a vocational expert as to whether there is work in the national economy that a person with

plaintiff's limitations can perform.  <u>Sanders v. Sullivan</u>, 983 F.2d 822, 824 (8th Cir. 1992).

## VI.  Conclusion

For the foregoing reasons, the Commissioner's decision that plaintiff was not under a disability is not supported by substantial evidence on the record as a whole.  Given the ALJ's determination as to the nature and existence of plaintiff's nonexertional impairments, the Commissioner upon remand should consult and obtain testimony from a vocational expert as to whether and to what extent plaintiff can perform work as it exists in the national economy.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this matter be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **August 10, 2009.**  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).



UNITED STATES MAGISTRATE JUDGE


Dated this _29th_ day of July, 2009.